# ORIGINAL

Josh Aicklen, Esquire
Nevada Bar 7254
Selman Breitman LLP
7251 W. Lake Mead Blvd. Suite 300
Las Vegas, NV  89128
(702) 562-6010
RESIDENT COUNSEL

Gina Fiss, Esquire
Maryland Bar
EPILEPSY FOUNDATION
4351 Garden City Drive
Landover, MD  20785
(301) 918-3762
COUNSEL FOR AMICUS CURIAE
EPILEPSY FOUNDATION®

## UNITED STATES  DISTRICT COURT
### DISTRICT OF NEVADA

JARED JIBBEN,

      Plaintiff,

  v.

UNITED PARCEL SERVICE,

      Defendant.

Case No.    CV-02-0039-~~KJD~~ DAE (RJJ)

## **MOTION FOR LEAVE**

### TO FILE BRIEF AMICUS CURIAE AND BRIEF OF
### THE EPILEPSY FOUNDATION® IN SUPPORT OF PLAINTIFF'S MOTION IN
### OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT



## UNITED STATES  DISTRICT COURT
## DISTRICT OF NEVADA

JARED JIBBEN,)
)
PLAINTIFF,)
)
vs.),                                          : **CASE NO.   CV-02-0039-KJD(RJJ)**
)
UNITED PARCEL SERVICE,)
)
DEFENDANT)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, as adopted by the Ninth Circuit Court of Appeals, addressing the disclosure obligations of *amicus curiae*, the undersigned attorney for the Epilepsy Foundation, on behalf of *amicus curiae*, certify that there is no parent corporation and no publicly held company owns 10% or more of the corporation's equity.

BY _____

Gina Fiss, Esquire

i

# **TABLE OF CONTENTS**

MOTION FOR LEAVE ........................................................................................................ I

CORPORATE DISCLOSURE STATEMENT ...................................................................... I

TABLE OF CONTENTS .................................................................................................... II

TABLE OF AUTHORITIES ............................................................................................. III

MOTION FOR LEAVE TO FILE BRIEF AMICUS CURIAE ...................................... A

STATEMENT OF THE ISSUES AND INTEREST OF AMICUS CURIAE .................................... I

SUMMARY OF THE ARGUMENT .................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.      DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON GROUNDS
        THAT MR. JIBBEN IS NOT PROTECTED BY THE AMERICANS WITH
        DISABILITIES ACT SHOULD BE DENIED BECAUSE MR. JIBBEN HAS A
        DISABILITY UNDER THAT ACT ............................................................................. 2

        A.      Mr. Jibben has a disability under the ADA because he has a physical
                impairment that substantially limits one or more major life activities. ................ 2

                1.      Epilepsy is a physical impairment that affects the central nervous
                        system ................................................................................................ 2

                2.      Mr. Jibben's epilepsy substantially limits him in the major life
                        activities of work, reproduction, sexual relations, caring for oneself,
                        and social interaction ......................................................................... 4

                        a.      Mr. Jibben is substantially limited in the major life activity
                                of work because of his epilepsy. ............................................. 5

                        b.      Mr. Jibben is substantially limited in the major life activities
                                of reproduction and sexual relations by his epilepsy. .................... 7

                        c.      Mr. Jibben is substantially limited in the major life activity
                                of caring for oneself. ............................................................. 9

                        d.      Mr. Jibben is substantially limited in the major life activity
                                of social interaction by his epilepsy. ...................................... 11

        B.      Mr. Jibben has a record of a physical impairment that substantially limits a
                major life activity. ....................................................................................... 13

        C.      Mr. Jibben was "regarded as" disabled by his employer. ..................................... 14

II.     PEOPLE WITH EPILEPSY ARE WITHIN THE CLASS OF PERSONS
        CONGRESS INTENDED TO PROTECT WHEN IT ENACTED THE
        AMERICANS WITH DISABILITIES ACT. ............................................................... 15

III.    CONCLUSION .......................................................................................................... 16

CERTIFICATE OF COMPLIANCE .................................................................................. 17

CERTIFICATE OF SERVICE ........................................................................................... 18

# TABLE OF AUTHORITIES

## FEDERAL CASES

Bragdon v. Abbott, 524 U.S. 624, 641 (1998) ..............................................................5, 8

Chenoweth v. Hillsborough County, 250 F.3d 1328, 1330 (11th Cir. 2001), cert. denied, 2002
    U.S. Lexis 697..........................................................................................................8

Humphrey v. Memorial Hospitals Ass'n, 239 F.3d 1128 (9th Cir. 2001) ..........................9

McAlindin v. County of San Diego, 192 F.3d 1226, 1234 (9th Cir. 1999) ...................7, 11

Otting v. J.C. Penney Co., 223 F.3d 704 (8th Cir. 2000 ..................................................2

Reynolds v. Brock, 815 F.2d 571 (9th Cir. 1987).......................................................5, 7

Sutton v. United Airlines, Inc., 527 U.S. 471 (1999 ..................................................5, 14

Toyota Motor MFG., KY, Inc. v. Williams, 534 U.S. 184 (2002) ...........................4, 6, 8


## STATE CASES

42 U.S.C. § 12102(2)(a) (1999) ...............................................................................2, 14

Cal. Code Ch. 7 § 15250 (2002) ...................................................................................6

Hawaii Rev. Stat. § 122-3 ............................................................................................6

## CASES

Americans with Disabilities Act Compliance Manual,
    http://www.eeoc.gov/policy/docs/902cm.html, § 902.7 (1999)...........................13

Andrew G. Herzog et al., Three Patterns of Catamenial Epilepsy, 38 Epilepsia 1082 (1997)..........5

Andrew Herzog, Disorders of Reproduction and Fertility, in Epilepsy: A Comprehensive
    Textbook 2013, 2017 (J. Engel, Jr. and T.A. Pedley eds. 1997)........................8, 9

Epilepsy: A Report to the Nation (Epilepsy Foundation of America ed. 1999). ...................7, 9, 11

H. Gastaut, Dictionary of Epilepsy, Part 1: Definitions (1973).........................................3

How to Recognize and Classify Seizures & Epilepsy; A Guide for Allied Health Professionals,
    (Epilepsy Foundation ed. 2002) ...............................................................................4

Kimford J. Meador, M.D., Cognitive Outcomes and Predictive Factors in Epilepsy, 58(Supp. 5)
    Neurol. S21, S23 (2002) ........................................................................................10

Nancy Santilli, Selection and Discontinuation of Antiepileptic Drugs, in Managing Seizure
    Disorders: A Handbook for Health Care Professionals (N. Santilli ed. 1996) ....................4

R.A. Hicks & M.J. Hicks, Attitudes of Major Employers Toward the Employment of People
with Epilepsy: A 30-Year Study, 32(1) Epilepsia 86 (1991) ................................................7

Robert S. Fisher et al., A Large, Community-based Survey of Quality of Life and Concerns of
People with Epilepsy: Part 1. Address at the American Epilepsy Society Annual
Meeting, San Diego, Cal. (Dec. 9, 1998). .............................................................................12

Steve Schachter, Treatment of Seizures, in The Comprehensive Evaluation and Treatment of
Epilepsy: A Practical Guide (S. Schachter & D. Schomer eds. 1997)....................................5

W. Allen Hauser & D.C. Hesdorffer, Employment, in Epilepsy: Frequency, Causes and
Consequences 273 (Epilepsy Foundation of America ed. 1990) ...........................................7

## STATUTES

14 C.F.R. § 67 (2003) ....................................................................................................................6

29 C.F.R. § 1613.702(c) .................................................................................................................6

29 C.F.R. § 1630.2(h)(1) (2000) ...................................................................................................3

29 C.F.R. § 1630.2(j)(1) (2000) ....................................................................................................5

29 C.F.R. § 1630.2(j)(2) (2000) ....................................................................................................4

29 C.F.R. § 1630.2(k) (2004).......................................................................................................13

29 C.F.R. § 1630.2(o)(2)(ii)(2000) ..............................................................................................15

29 C.F.R. § 1630.2(o)(3) (2000). .................................................................................................15

45 C.F.R. § 84.3(j)(2)(i)(2001) ......................................................................................................3

49 C.F.R. § 391.41 (2002).............................................................................................................6

Nevada Admin. Code ch. 483, § 803 (2002) ................................................................................6

## STATE RULES

135 Cong. Rec. E1575 (1989).....................................................................................................16

136 Cong. Rec. S7422, S7442 (1990)..........................................................................................11

H.R. Rep. No. 101-485(II) (1990), reprinted in 1990 U.S.C.C.A.N. 267.....................................16

H.R. Rep. No. 101-485(III) (1990), reprinted in 1990 U.S.C.C.A.N. 267, 445 ..............................16

S. Rep. No. 101-116 (1989) ........................................................................................................15

Josh Aicklen, Esquire
Nevada Bar 7254
Selman Breitman LLP
7251 W. Lake Mead Blvd. Suite 300
Las Vegas, NV  89128
(702) 562-6010
RESIDENT COUNSEL

Gina Fiss, Esquire
Maryland Bar
EPILEPSY FOUNDATION
4351 Garden City Drive
Landover, MD  20785
(301) 918-3762
COUNSEL FOR AMICUS CURIAE
EPILEPSY FOUNDATION®

## UNITED STATES  DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| JARED JIBBEN, | Case No.   CV-02-0039-KJD (RJJ) |
| Plaintiff, | |
| v. | |
| UNITED PARCEL SERVICE, | |
| Defendant. | |

## MOTION FOR LEAVE TO FILE BRIEF AMICUS CURIAE

The Epilepsy Foundation® ("Epilepsy Foundation") by and through undersigned attorneys and pursuant to this Court's local rules, and Rule 29 of the Federal Rules of Appellate Procedure, hereby moves this Court for leave to file the accompanying brief *amicus curiae* in support of Plaintiff, Jared Jibben, urging denial of Defendant's Motion for Summary Judgment.  In support of this motion, *amicus curiae* states as follows:

/ / /

/ / /

/ / /

a

1.      As stated in the accompanying brief, the Epilepsy Foundation is a nonprofit corporation founded in 1968 to advance the interests of 2.5 million Americans with epilepsy and seizure disorders.  With its affiliates throughout the nation, the Epilepsy Foundation maintains and disseminates information about epilepsy and seizures; promotes public understanding of the disorder; and supports research, professional awareness and advocacy on behalf of people with seizure disorders.  Because the term "epilepsy" evokes stereotyped images and fears in others that affect persons with this medical condition in all aspects of life, especially employment, the Epilepsy Foundation has, since its inception, worked to dispel the stigma associated with seizures, and has supported the development of laws, including the Americans with Disabilities Act, that protect individuals from discrimination based on these stereotypes and fears.

2. The Epilepsy Foundation is deeply concerned that this court's interpretation of the Americans with Disabilities Act ("ADA") and in particular, the definition of disability under that Act, will affect not only Mr. Jibben, but also all people with epilepsy in the State of Nevada.

3. The Epilepsy Foundation et al. have reason to believe that its brief will supplement rather than reiterate the arguments made by Plaintiff.

4. Defendant has not provided written consent to this motion.  The Epilepsy Foundation, therefore, requests leave of this Court.

WHEREFORE, the Epilepsy Foundation requests that this Court give leave for the Epilepsy Foundation to file the accompanying brief *amicus curiae* in support of Plaintiff, Jared Jibben, in urging denial of the Defendant's Motion for Summary Judgment.

Respectfully submitted,

By _____
        Gina Fiss, Esquire

b

## STATEMENT OF THE ISSUES AND INTEREST OF AMICUS CURIAE

This Court is asked to decide whether, as a matter of law, Defendant Employer United Parcel Service engaged in a discriminatory employment practice in violation of the Americans with Disabilities Act ("ADA"). A central issue in this case is whether Plaintiff Jared Jibben, who has epilepsy, has a disability within the meaning of the ADA, 42 U.S.C. § 12102(2). *Amicus Curiae* Epilepsy Foundation supports Plaintiff's Motion in Opposition to Defendant's Motion for Summary Judgment in its entirety, but in the interest of judicial economy will address only the threshold question of whether Mr. Jibben is a person with a disability under the ADA. This Court's disposition of this issue will impact all similarly situated persons within this Court's jurisdiction.

*Amicus Curiae* Epilepsy Foundation can provide this Court with a unique perspective on this issue. Since 1968, the Epilepsy Foundation-- the sole, national voluntary nonprofit corporation dedicated to improving the quality of life for those with epilepsy -- has worked to dispel the stigma associated with seizures and has supported the development of laws, including the Americans with Disabilities Act, that protect individuals from discrimination.

1

# SUMMARY OF THE ARGUMENT

This Court should hold that Plaintiff, Jared Jibben is disabled, as a matter of law, under the Americans with Disabilities Act ("ADA"). The ADA's definition of disability covers individuals whose physical impairment substantially limits one or more major life activities, who have a record of such an impairment or who are regarded as having such an impairment.

Epilepsy is a chronic brain disorder, characterized by recurrent seizures. While the seizures themselves may last only a few seconds or minutes, the impact of the condition is more profound and long-lasting. People with epilepsy must: contend with the stigma of seizures, tailor their daily schedules to fit rigorous medication schedules, take daily precautions to avoid additional seizures and live with the constant threat of another seizure occurring at any time. Many people with chronic seizures experience cognitive impairment and memory loss, often worsening over time. The physiological changes brought about by seizures and/or the side effects of medications also limit the individual's ability to engage in sexual relations and reproductive activities. Those with epilepsy are also significantly limited in the major life activity of working, as evidenced by an unemployment rate five times greater than that in the general population. A medical diagnosis of epilepsy is a bar to employment as a commercial truck driver, as a pilot, and entry into the military branches of service.   In short, epilepsy is a physical impairment that substantially limits many major life activities, even when treated with medication, and therefore, qualifies as a disability under the ADA.

Furthermore, Mr. Jibben has a record of such an impairment. On two different occasions, he was told by his doctor to cease all work activities — a substantial limitation which was not only documented in the defendant's own records but also served as the catalyst for asking him to file for long-term disability benefits.

Mr. Jibben was also regarded by the company as having a physical impairment that substantially limits his ability to engage in the major life activity of working. After Mr. Jibben had seizures, rather than reassign Mr. Jibben to a vacant position that would require 45 hours or less per week, including part-time positions or nonmanagerial positions, the defendant concluded he was unable to perform any job because his medical restrictions made him unable to perform

1

1    certain aspects of his present job.

2    In enacting the Americans with Disabilities Act, Congress explicitly recognized that

3    people with epilepsy were among those intended to be protected by the law. Defendant's assertion

4    that Mr. Jibben is not disabled conflicts with this express intent and undermines the very purpose

5    of the ADA. The Epilepsy Foundation therefore urges this Court to deny summary judgment to the

6    Defendant, on the grounds that Mr. Jibben is disabled under the ADA as a matter of law and to

7    recognize that epilepsy can substantially limit one or more major life activities even when some of

8    its symptoms, i.e. seizures, are episodic.

9    **ARGUMENT**

10   **I.    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON GROUNDS THAT**

11   **MR. JIBBEN IS NOT PROTECTED BY THE AMERICANS WITH DISABILITIES**

12   **ACT SHOULD BE DENIED BECAUSE MR. JIBBEN HAS A DISABILITY UNDER**

13   **THAT ACT.**

14   Mr. Jibben is disabled, as a matter of law, under the Americans with Disabilities Act

15   ("ADA"). The ADA defines "disability" as "(A) a physical or mental impairment that

16   substantially limits one or more of the major life activities of such individual; (B) a record of such

17   an impairment; or ; (C) being regarded as having such an impairment." 42 U.S.C. §

18   12102(2)(a) (1999). Mr. Jibben has a disability under each of the enumerated prongs.

19   **A.    Mr. Jibben has a disability under the ADA because he has a physical**

20   **impairment that substantially limits one or more major life activities.**

21   Mr. Jibben's epilepsy is a physical impairment that substantially limits him in the major

22   life activities of work, reproduction, sexual relations, caring for oneself, and social interaction.

23   Thus, he has an actual disability under the ADA, 42 U.S.C. § 12102(2)(A).

24   **1.    Epilepsy is a physical impairment that affects the central nervous**

25   **system.**

26   Epilepsy, a neurological disorder characterized by recurrent seizures, is a physical

27   impairment under the Americans with Disabilities Act. See Otting v. J.C. Penney

28   Co., 223 F.3d 704 (8th Cir. 2000) (recognizing that epilepsy is a physical

2

impairment under the Americans with Disabilities Act).  Under the Americans with Disabilities Act and its implementing regulations, a physical impairment includes "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological . . . ." 29 C.F.R. § 1630.2(h)(1) (2000); See also 45 C.F.R. § 84.3(j)(2)(i)(2001)(Department of Health, Education and Welfare Regulations implementing identical provisions under the ADA's companion law, Rehabilitation Act of 1973.)  Epilepsy is a chronic neurological disorder, characterized by recurrent seizures. Mr. Jibben has been diagnosed as having epilepsy.  Jibben Aff. ¶ 6.

Physiologically, seizures are sudden, unexpected, uncontrolled episodes of excessive electrical discharges of brain cells, accompanied by sensory, motor and/or behavioral changes. See H. Gastaut, Dictionary of Epilepsy, Part 1: Definitions (1973) (defining "epilepsy").  There are many different types of seizures and many different causes.  There are two general categories of seizures:  (1) "partial seizures," which are seizures whose onset is limited to a part of one cerebral hemisphere, and (2) "generalized seizures," which are seizures that, from onset, are diffused throughout the brain.  The type of seizure Mr. Jibben suffers from, grand mal or tonic clonic seizures, fall in the latter category.

Generalized tonic clonic seizures are convulsive seizures that result from a complete loss of muscle tone and massive muscle contractions.  Typically, the person's eyes roll up or turn to the side, and the individual may bite his tongue.  Loss of continence is common as is irregular respiration.  When respiration returns to normal and the convulsions cease, the individual enters the post-ictal period described above.  In Mr. Jibben's case, the seizures occur generally only at night, and may last between thirty seconds and two minutes.  Jibben Aff. 6.

Seizures affect various parts of the body.  Like many with epilepsy, Mr. Jibben suffers impaired consciousness and is unable to walk, see, hear speak during a seizure.  While the seizures themselves are short, they are often followed by a prolonged period of disorientation, severe exhaustion, and shakiness known as the post-ictal period.  The post-ictal period can be as long as twenty-four to thirty-six hours, as is true for Mr. Jibben.  Jibben Aff. 6. See also How to

3

1  Recognize and Classify Seizures & Epilepsy; A Guide for Allied Health Professionals, 10, 13

2  (Epilepsy Foundation ed. 2002). During this post-ictal period, Mr. Jibben is severely limited in his

3  ability to engage in regular activities, such as work, social activities and the daily tasks of caring

4  for oneself, because of the cognitive confusion and physical exhaustion.

5      For these reasons, epilepsy is a physical impairment under the ADA and its implementing

6  regulations.

7          **2.      Mr. Jibben's epilepsy substantially limits him in the major life activities**

8                  **of work, reproduction, sexual relations, caring for oneself, and social**

9                  **interaction.**

10     Under the Americans with Disabilities Act, an impairment is "substantially limiting" if it

11  "prevents or severely restricts the individual from doing activities that are of central importance to

12  most people's daily lives. The impairment's impact must also be permanent or long-term."

13  Toyota Motor MFG., KY, Inc. v. Williams, 534 U.S. 184, 185 (2002). Notably, in Toyota Motor

14  MFG., the Supreme Court made clear that there need not be a nexus between the major life

15  activity that is affected by the medical condition and the individual's ability to work. Id.. at 201.

16     The Equal Employment Opportunity Commission's (EEOC) implementing regulations

17  further direct that, in determining if an impairment is substantially limiting, the nature and severity

18  of the impairment should also be considered. 29 C.F.R. § 1630.2(j)(2) (2000). Epilepsy is a

19  chronic impairment, whose symptoms may be mitigated in varying degrees through medication,

20  lifestyle changes, surgery, dietary modifications or assistive technology. Indeed, Mr. Jibben

21  continues to experience a minimum of two seizures a month even though he is on medication to

22  control them. Jibben Aff. ¶ 6. Yet even where medication or medical treatment is effective in

23  reducing the frequency of seizures generally, a person may still experience periods of greater than

24  usual seizure activity due to stress, irregular sleep schedule, hormonal changes, viral illness or

25  changes in medication. See Nancy Santilli, Selection and Discontinuation

26  of Antiepileptic Drugs, in Managing Seizure Disorders: A

27  Handbook for Health Care Professionals (N. Santilli ed. 1996)

28  (identifying illness as a cause of breakthrough seizures); Steve Schachter, Treatment

4

1 of Seizures, in The Comprehensive Evaluation and Treatment of

2 Epilepsy: A Practical Guide (S. Schachter & D. Schomer eds.

3 1997) (identifying lack of sleep and changes in medication as causes of breakthrough seizures);

4 Andrew G. Herzog et al., Three Patterns of Catamenial Epilepsy,

5 38 Epilepsia 1082 (1997).

6   The regulations also provide that an impairment is substantially limiting "if it significantly

7 restricts the duration, manner or condition under which an individual can perform a particular

8 major life activity as compared to the average person in the general population . . . ." 29 C.F.R. §

9 1630.2(j)(1) (2000) (defining "substantially limits"); see also Bragdon v. Abbott, 524 U.S. 624,

10 641 (1998) (holding that an impairment is substantially limiting even if the difficulties resulting

11 from the impairment are not "insurmountable"). In determining whether a condition is so limiting,

12 the Supreme Court, in Sutton v. United Airlines, 527 U.S. 471 (1999), instructed lower courts to

13 consider both the negative and positive effects of measures, including the side effects of

14 medications, used to treat the medical condition. See id. at 482. Thus, in determining whether Mr.

15 Jibben is disabled under the ADA, the impact of the underlying condition and his medication on

16 his life must be considered together along with the impact of his seizures. The frequency of the

17 seizures, at least two a month or twenty-four a year in Mr. Jibben's case, must also be considered

18 in determining whether the limits are substantial. When all of these factors are considered

19 together, Mr. Jibben's epilepsy substantially limits one or more major life activities.

20    **a.** **Mr. Jibben is substantially limited in the major life activity of**

21     **work because of his epilepsy.**

22   In his Motion in Opposition to Defendant's Motion for Summary Judgment, Plaintiff sets

23 forth the appropriate legal standard for determining when an individual is substantially limited in

24 the major life activity of work for the purposes of the ADA, and argues at length that he is

25 substantially limited in the major life activity of work. See Plaintiff's Motion, pp.15 –18.

26 Amicus Curiae joins the Plaintiff in asking this Court to adopt the reasoning of the Ninth Circuit in

27 Reynolds v. Brock , 815 F.2d 571 (9th Cir. 1987), and to hold that Mr. Jibben is disabled because

28 he is substantially limited in the major life activity of work by his epilepsy.

1   That Reynolds v. Brock was decided under the Rehabilitation Act, and not the ADA,

2   should not affect the Court's disposition in this case. The Americans with Disabilities Act

3   borrowed its definition of disability from its predecessor the Rehabilitation Act, and the language

4   of the implementing regulations for both federal laws is identical. See 29 C.F.R. § 1613.702(c)

5   (Rehabilitation Act); 29 C.F.R. § 1630.2(i) (ADA). See Toyota Motor Mfg v. Williams, 534 U.S.

6   184, 193-194 (2002) (noting that Congress intended the definition of disability in the ADA to be

7   construed "in accordance with pre-existing regulatory interpretations.")

8   Furthermore, the restrictions on working as a commercial truck driver or pilot, and joining

9   the military, which served as the foundation for the Ninth Circuit's decision in Reynolds v. Brock,

10  are still in effect today. 49 C.F.R. § 391.41 (2002) (barring people who take anticonvulsants or

11  who have a current or history of epilepsy from obtaining a federal commercial driver's license.)

12  See also, e.g., Cal. Code Ch. 7 § 15250 (2002) (adopting federal standards); Hawaii Rev. Stat. §

13  122-3 (adopting federal standards for all commercial vehicles except taxi cars); see also Nevada

14  Admin. Code Ch. 483, § 83 (2002) (adopting federal standards but permitting exceptions in

15  limited situations). See 14 C.F.R. § 67 (2003) (prohibiting a person with a seizure disorder or

16  history of a seizure disorder other than febrile seizures before age five from obtaining the required

17  medical certification to obtain a pilot's license). Nor is the Ninth Circuit's list of classes of jobs

18  from which a person with epilepsy is precluded from performing exhaustive.

19  Because of sleep deprivation and the stress associated with shift work and irregular

20  schedules, Mr. Jibben, like many others with epilepsy, is precluded from engaging in any job

21  requiring rotating shifts, irregular hours or night-time shifts. A broad range of jobs commonly

22  require irregular schedules, rotating shift work or night time assignments, including, for example,

23  factory work, parcel and mail delivery, newspaper presses, journalists, warehouse stockpersons,

24  night managers of a company or store, construction worker, night shift store and plant managers.

25  And while many people may choose not to take such jobs because of the inconvenient schedules,

26  for Mr. Jibben, there is no choice to be made. His medical condition precludes all such

27  employment. Jibben Aff. 8 (describing how his doctor restricted him for working irregular shifts).

28  Mr. Jibben is not only excluded from more classes of jobs than the Ninth Circuit

6

1   considered in <u>Reynolds v. Brock</u>, *supra*, but his general job prospects are also more dismal than

2   they were when that case was decided.  It is estimated that at least twenty-five percent (25%) of

3   working-age people with epilepsy are unemployed; among those whose seizures are poorly

4   controlled, the unemployment rate is even higher.  See <u>Epilepsy: A Report to the Nation</u> 11

5   (Epilepsy Foundation of America ed. 1999).  By way of comparison, during the same time period,

6   the unemployment rate for the general population was only five percent (5%).  See <u>id.</u>  Notably,

7   this rate is significantly higher than at the time the court decided <u>Reynolds v. Brock</u>, when the

8   unemployment rate was only two times higher. 815 F.2d 571, 574 (1987).  The fluctuation in rate

9   implies that the unemployment rate for people with epilepsy remains at about 25 percent, even as

10  the overall unemployment rate for the general population changes. Notably, the primary causes of

11  this high unemployment rate among persons with epilepsy are the frequency of seizures and the

12  attitudes of employers.  See <u>Id.</u>; see also, R.A. Hicks & M.J. Hicks, <u>Attitudes of Major Employers</u>

13  <u>Toward the Employment of People with Epilepsy:  A 30-Year Study</u>, 32(1) Epilepsia 86-88

14  (1991);  W. Allen Hauser & D.C. Hesdorffer, <u>Employment</u>, in <u>Epilepsy: Frequency, Causes and</u>

15  <u>Consequences</u> 273, 279 (Epilepsy Foundation of America ed. 1990).  For those who are able to

16  obtain jobs, the probability of continued employment is also significantly lower (26 percent

17  among men and 21 percent among women) for people with controlled seizures than among those

18  who do not have seizures at all.  See <u>Epilepsy: A Report to the Nation</u>, supra.

19   In short, a diagnosis of epilepsy significantly limits an individual's employment

20  opportunities and ability to retain a job.  We urge this Court to adopt the reasoning followed by the

21  Ninth Circuit Court of Appeals in <u>Reynolds v. Brock</u>, and to find that Mr. Jibben is disabled under

22  the Americans with Disabilities Act as a matter of law because he is substantially limited in the

23  major life activity of work.

24                     **b.**     **Mr. Jibben is substantially limited in the major life activities of**

25                          **reproduction and sexual relations by his epilepsy.**

26   Epilepsy imposes significant physiological and psychological limitations on a man's

27  ability to engage in the major life activities of reproduction and sexual relations.  See <u>McAlindin</u>

28  <u>v. County of San Diego</u>, 192 F.3d 1226, 1234 (9th Cir. 1999) (holding that procreation and

7

1   engaging in sexual relations are major life activities).  That these major life activities are unrelated

2   to Mr. Jibben's ability to work should have no bearing on this Court's decision. As the Supreme

3   Court directed in Toyota Motor MFG., KY, Inc., the court need only determine that the physical

4   impairment substantially limits a major life activity, whether or not that major life activity is

5   work-related. 534 U.S. at 201.  See also Bragdon v. Abbott, 524 U.S. at 641 (holding that the

6   aggrieved was disabled under the ADA because he was substantially limited in the major life

7   activity of reproduction, even though such limitation had no relationship to the discriminatory

8   conduct involved, which was access to a public accommodation).

9       In Bragdon v. Abbott, the Supreme Court, upon reviewing the evidence concerning the risk

10  of transmitting HIV to an unborn child and the economic and legal costs of the condition, opined,

11  "[i]n the end, the disability definition does not turn on personal choice.  524 U.S. at 641. When

12  significant limitations result from the impairment, the definition is met even if the difficulties are

13  not insurmountable." Id.  In that case, the Court found that asymptomatic HIV substantially

14  limited the major life activity of reproduction because of the risk of transmitting the disease

15  through sexual intercourse (20 to 25 percent) or through childbirth (which was at least 8 percent

16  but as high as 25 percent).  Id.  Epilepsy has a comparable impact on an individual's ability to

17  engage in sexual relations and reproduction.  See  Chenoweth v. Hillsborough County, 250 F.3d

18  1328, 1330 (11th Cir. 2001), cert. denied, 2002 U.S. Lexis 697 (concluding that epilepsy and the

19  side effects of medication substantially limited the plaintiff in the major life activity of

20  reproduction).

21      Mr. Jibben has provided testimony that he suffers from decreased sexual drive and is

22  concerned about his ability to reproduce.  Jibben Aff. ¶8.  Sexual dysfunction and reproductive

23  dysfunction are, in fact, very common among people with epilepsy; more than one study has

24  concluded these disorders are more prevalent among people with epilepsy than in those without

25  epilepsy.  Mimi Callanan, R.N., Sexual Assessment & Intervention for People with Epilepsy, 3(1)

26  Clinical Nursing Practice in Epilepsy 7 (1996); Andrew Herzog, Disorders of Reproduction and

27  Fertility, in Epilepsy: A Comprehensive Textbook 2013, 2017 (J. Engel, Jr. and T.A. Pedley eds.

28  1997) (hereinafter Disorders);  Sexual dysfunction is defined as a marked decrease in sexual

8

desire, erectile dysfunction, and an inability to ejaculate or premature ejaculation. Callanan, supra. Reproductive dysfunction in men includes diminished potency and abnormal sperm characteristics, which in turn affects their ability to impregnate a woman. Herzog, Disorders, supra. One study concluded that thirty-eight to seventy-one percent (38%-71%) of men with epilepsy experience reproductive dysfunction. Id. Scientists speculate that the dysfunction is brought about by both the disruption to the limbic function and the impact of seizures on normal hormone levels, as well as the impact of medicines used to control seizures. Id. The prescription medicine Mr. Jibben takes, Carbamazepine[1] has specifically been found to alter the level of testosterone and bring about reproductive dysfunction. Id. See Jibben Aff. ¶8.Dysfunction also has psychological consequences. Sexual and reproductive dysfunction associated with epilepsy can lead to depression, anxiety, and conflict in interpersonal relationships, which in turn leads to greater social isolation. Callanan, supra. Indeed, men with epilepsy are thirty to sixty percent (30-60%) less likely to have a child than their siblings without epilepsy. Herzog, Disorders, supra. The higher rates of sexual and reproductive dysfunction, and lower rates of procreation among men with epilepsy compared to peers and siblings without epilepsy are hardly inconsequential. Mr. Jibben is therefore, disabled under the ADA.

        **c.    Mr. Jibben is substantially limited in the major life activity of caring for oneself.**

Mr. Jibben is substantially limited in the major life activity of caring for oneself by his epilepsy. See Humphrey v. Memorial Hospitals Ass'n, 239 F.3d 1128 (9th Cir. 2001) (holding that caring for oneself is a major life activity). Though seizures are a physiological phenomena, they have both physical and psychological consequences.

During Mr. Jibben's seizures, he loses the ability to walk, talk, control his muscles, and interact with the environment. Jibben Aff. ¶9. This in turn affects his ability to engage in routine activities such as working, socializing, gardening, driving, eating, cooking and even going to the bathroom. People with epilepsy are also at greater risk of injury; fractures and burns are major hazards. Epilepsy: A Report to the Nation , supra, at 12.

---

[1] Mr. Jibben takes Tegretol®, which is one of the name brands of Carbamazepine.

1    Moreover, Mr. Jibben, like others with epilepsy, experiences consequences even after the

2    seizure has ended. Mr. Jibben's suffers from memory problems, disorientation and exhaustion for

3    twenty-four to thirty –six hours—or the post-ictal period- following the seizure. Jibben Aff. ¶ 6.

4    These continuing effects mean missing out on social activities, work  and even common everyday

5    activities for at least a day and as long as a day and a half each time he has a seizure. Since Mr.

6    Jibben generally has at least two seizures a month, or twenty-four seizures a year, this amounts to

7    twenty-four to thirty-six days during the year, all at unpredictable intervals, when Mr. Jibben is

8    unable to care for himself and follow his regular routine. It also makes planning for any events

9    difficult. In other words, the effects of Mr. Jibben's seizures substantially limit his ability to care

10   for himself and take part in everyday activities.

11   Epilepsy affects not only one's physical health and physical ability to perform daily tasks.

12   It can also alter the person's daily schedule and behavioral patterns. The person must adjust his

13   daily schedule and activities to avoid possible seizure triggers, such as exhaustion and stress, and

14   to accommodate medication schedules. Adhering to a rigid sleep schedule, avoiding alcohol,

15   setting work breaks and lunch periods to accommodation medication schedules, and avoiding

16   work that requires irregular shifts or night time shifts are some of the most common schedule

17   modifications.

18   The side effects of medications also require schedule modifications and affect the

19   individual's ability to carry out routine tasks. Carbamazepine, which Mr. Jibben was taking at the

20   time, for example, may cause slurred speech, double vision, nausea, dizziness, and poor

21   coordination. It may also affect cognitive function, causing memory and recall problems in some

22   individuals. Kimford J. Meador, M.D., Cognitive Outcomes and Predictive Factors in Epilepsy,

23   58(Supp. 5) Neurol. S21, S23 (2002). These limitations on one's physical capacity in turn affect

24   his ability to participate in routine activities. After having a seizure, or when trying out new

25   medicines, the individual will have to refrain from common activities such as driving until the

26   proper medication schedule has been determined and seizure control regained. This in turn

27   requires making alternative arrangements for rides, using more time-consuming public

28   transportation, or foregoing certain activities altogether, including work, food shopping and social

1  activities, until he is able to drive safely.  One's daily schedule is also subject to unexpected, but

2  time-consuming interruptions, due to the seizures themselves as well as the post-ictal period.  As

3  previously mentioned, Mr. Jibben is often unable to engage in regular activities 24 to 36 hours

4  after the actual seizure has ended because of the disorientation and shakiness he experiences

5  during the post-ictal (post-seizure) stage.

6      Mr. Jibben is also limited in his ability to care for himself by the psychological effects of

7  epilepsy.  Psychological effects include the fear of having another seizure at any time, low self

8  esteem, and enduring the stigma that is associated with seizures.  Fifty percent (50%) of people

9  with epilepsy reported that the single worst thing about epilepsy was living with the fear of

10  another seizure.  See Epilepsy: A Report to the Nation, supra, at 11.

11      These physical and psychological limitations, combined with the effects of epilepsy on Mr.

12  Jibben's physical abilities, are significant.  Most people when they are ill do not need to miss work

13  once they are feeling better, nor are most people physically incapacitated by a physical impairment

14  for any part of the day.  Mr. Jibben is, however, sometimes incapacitated because of his epilepsy.

15  He is, in short, significantly limited in his ability to physically care for himself on a daily basis.

16          **d.      Mr. Jibben is substantially limited in the major life activity of**

17          **social interaction by his epilepsy.**

18      The stigma associated with epilepsy combined with the physical limits imposed by the

19  condition substantially limits the major life activity of interacting with others.  See McAlinden v.

20  County of San Diego, 192 F.3d 1226, 1234 (9th Cir. 1999) (holding that interacting with others is a

21  major life activity).

22      Indeed, in enacting the ADA, Congress recognized that the irrational fears and

23  misperceptions about disabilities, including epilepsy, can be as debilitating as the impairments

24  themselves.  See 136 Cong. Rec. S7422, S7442 (1990) (statement of Sen. Harkin) ("[T]he fear of

25  epilepsy was once so great that people with this disease were believed to be possessed by the devil

26  and were shut out of schools and the workforce.").[2]  The Supreme Court itself has also recognized

27

28  ---
[2]      Historically, seizures were viewed as a frightening and horrible disease that afflicted both body and
soul.  People thought that those with seizures were possessed by demons or were mentally ill.  See, e.g., L.

11

that epilepsy is a stigmatizing condition.  See School Bd. of Nassau County, Fla. v. Arline, 480

U.S. 273, 284 (1987).  Today, despite advances in medical knowledge and laws such as the ADA,

this stigma persists.[3]  Indeed, for many people with epilepsy, the stigma associated with the

condition and the social isolation that accompanies it is a major concern of living with epilepsy.

See Robert S. Fisher et al., A Large, Community-Based Survey of Quality of Life and Concerns of

People with Epilepsy: Part 1. Address at the American Epilepsy Society Annual Meeting, San

Diego, Cal. (Dec. 9, 1998).

Stigma affects social interactions on two levels.  On the most basic level, it affects the

individual's self esteem.  People with epilepsy typically internalize society's negative perceptions

(i.e. the stigma) and as a result, experience lowered self-esteem.  Hills & Baker, supra.  Stigma

also affects interpersonal relations: the greater the level of stigma, the greater the social isolation.

Id.; Morrell, supra.  People with epilepsy may avoid social situations, including going to public

places or engaging in intimate sexual relations, for fear of having a seizure.  Hills & Baker, supra.;

Callanan, supra.  The physical effects of the condition, such as sexual dysfunction, may cause

depression and conflict in interpersonal relationships.[4]

Seizures are also physically isolating and can stress social relationships.  When a person

has a seizure, certain physical activities, such as climbing or swimming, may be restricted for a

specific period of time, and driving privileges may be suspended for an extended period.  Losing

the ability to drive has a major impact on the person's life.  Not only is it more difficult to get to

work, but the individual needs to find alternative transportation to do such common activities as

shop for food, go to doctor's visits, and attend social functions.  Public transportation is not always

an alternative, either because service is limited or because it is not accessible in the individual's

---

Eisenberg, Sociocultural Perspectives, in Epilepsy: A Comprehensive Textbook 41 (1997).  As a result of these beliefs, people with epilepsy were subjected to horrific treatment, ranging from physical violence to extreme physical isolation, such as incarceration in institutions.  See id.  In fact, people who suffered from epilepsy were institutionalized until the latter half of this century.  See id.

[3]     The prevalence and persistence of irrational fears led the U.S. Centers for Disease Control Conference on Public Health and Epilepsy to conclude that the stigma associated with epilepsy and the factors which contribute to it should be addressed as a top priority.  See Eisenberg, supra note 3, at 12.

[4] See Morrell , supra.

1   area. The alternative then is to rely on friends and family for ride, which stresses those

2   relationships, or forego the activity altogether which leads to social isolation. In other words,

3   epilepsy substantially affects social interaction.

4   For all of the foregoing reasons, we ask this Court to deny the Defendant's Motion for

5   Summary Judgment and to hold that Mr. Jibben's is disabled under 42 U.S.C. § 12102(2)(A).

6   **B.      Mr. Jibben has a record of a physical impairment that substantially limits a**

7   **major life activity.**

8   Mr. Jibben's disability insurance benefit records are records of a physical impairment that

9   substantially limits a major life activity. The Equal Employment Opportunity Commission's

10   implementing regulations define "record of" as having "a history of, or has been misclassified as

11   having a mental or physical impairment that substantially limits one or more major life activities."

12   29 C.F.R. § 1630.2(k) (2004). Mr. Jibben's record of short- term disability benefits documents

13   that he has a history of a physical impairment (epilepsy) that substantially limits his ability to

14   engage in the major life activity of work. Not only was Mr. Jibben unable to perform his work as

15   a supervisor during that period, but he was unable to perform any job and thus was forced to take

16   medical leave. Jibben Aff. ¶8.

17   Under the "record of" provision, the fact that Mr. Jibben's condition improved sufficiently

18   to allow him to return to work for several months following the leave does not mean that the

19   limitation was not substantial. Under the implementing regulations, the question is whether the

20   limitations were substantial at the time the record was created. The Equal Employment

21   Opportunity Commission's Compliance Manual explains that the "record of" provision was

22   included by Congress to ensure that "coverage of the Act extends to persons who have recovered,

23   in whole or in part, from a disability but are subjected to discrimination because of their history of

24   a substantially limiting impairment." Americans with Disabilities Act Compliance Manual,

25   http://www.eeoc.gov/policy/docs/902cm.html, § 902.7 (1999) Since Mr. Jibben was unable to

26   perform any job during the period he was on short-term disability, he has a history of a physical

27   impairment that substantially limits him in the major life activity of working. To hold otherwise

28   would be to undermine Congress' intent in enacting this provision and to ignore the guidance of

13

1  the regulatory agency.

2  Moreover, the record shows that the Defendant classified Mr. Jibben's inability to work as
3  permanent, rather than limited to a finite period. Defendant sought to convert Mr. Jibben's May,
4  2000 application for short-term disability benefits to an application for long-term disability
5  benefits even though he had actually worked during some of the months in which they classified
6  him as being unable to work. Jibben Aff. ¶8. The reason proferred by Jim Bamberg, Mr. Jibben's
7  former supervisor, was that under the company's short-term disability insurance plan the period of
8  disability runs until the employee is "unconditionally released with no restrictions." Jibben Aff.
9  ¶8 (November 21, 2000). In short, Defendant (mistakenly) classified Mr. Jibben as unable to work
10 any job for an indefinite period. This conclusion is further corroborated by Mr. Bamberg's
11 repeated efforts to have Mr. Jibben apply for long-term dislibity benefits. Jibben Aff. ¶8
12 (November 23, 2000). Mr. Jibben, therefore, has both a history of, and has been misclassified as
13 having a physical impairment that substantially limits a major life activity. He is, thus, disabled
14 under the "record of" provision of the definition of disability under the ADA.

15  **C.  Mr. Jibben was "regarded as" disabled by his employer.**

16 Mr. Jibben was regarded as disabled by his employer. Under the ADA, an individual has
17 a "disability" if he is perceived as or treated as having such an impairment by his employer. 42
18 U.S.C. § 12102(2)(c) (2000). When the major life activity is work, the individual must show that
19 he was regarded as substantially limited in a broad class of jobs, not just one particular job. Sutton
20 v. United Airlines, Inc., 527 U.S. 471, 492 (1999). The Court concluded that the plaintiffs, who
21 were denied a job of global airline pilot, were not regarded as disabled in a broad class of jobs,
22 since they could still work as a commercial pilot, or as a pilot for a courier service. Id. at 493. By
23 contrast, in the instant case, Mr. Jibben was regarded as being unable to perform not just one job,
24 but rather a broad class of jobs. This broad class of jobs includes any and all jobs offered by the
25 parcel delivery company, from a truckloader, to office assistant, to mailroom personnel, to
26 supervisor.

27 Under the Americans with Disabilities Act, the employer is required to provide a
28 reasonable accommodation to a qualified individual with a disability. 42 U.S.C. § 12112(b)(5)(A)

14

1   (2000); 29 C.F.R. § 1630.2(o) (2000).  Mr. Jibben's twelve year track record with the company

2   attests to his qualifications to perform the job.  See Jibben ¶ 10.

3        Under the ADA, the employer, once it knows of an employee's disability, also has an

4   obligation to engage, in good faith, in an interactive discussion with the employee to identify such

5   accommodations.  29 C.F.R. § 1630.2(o)(3) (2000).  In situations where an individual's medical

6   condition makes it impossible for the person to perform his job for a specific period of time,

7   possible reasonable accommodations include reassigning nonessential job functions to other

8   coworkers or temporarily reassigning the individual to a vacant position.  29 C.F.R. §

9   1630.2(o)(2)(ii)(2000) (listing job restructuring, part-time or modified work schedules, and

10  reassignment to a vacant position as possible reasonable accommodations).

11       In the case before the court, the record does not show that the employer offered any

12  accommodation or even that the Defendant-employer engaged in a discussion about possible

13  reasonable accommodations.  Instead, the record shows that Defendant employer directed Mr.

14  Jibben to file for long-term disability benefits instead of exploring whether it would be possible to

15  reassign Mr. Jibben to any vacant position, including a nonsupervisory position, which would

16  require less than 45 hours per week.  By taking this action, the Defendant demonstrated that it

17  regarded Mr. Jibben as unable to perform any job at the 36,000 employee company.  It in effect

18  regarded him as being unable to perform any job at the company, whether on the road as a

19  supervisor, in the mailroom, loading trucks, or performing administrative tasks in the office.  That

20  is, the company regarded Mr. Jibben as being substantially limited in the major life activity of

21  working.

22  II.   **PEOPLE WITH EPILEPSY ARE WITHIN THE CLASS OF PERSONS**

23         **CONGRESS INTENDED TO PROTECT WHEN IT ENACTED THE AMERICANS**

24         **WITH DISABILITIES ACT.**

25       The legislative history of the ADA makes clear that Congress intended that persons with

26  epilepsy would fall within the definition of disability under the Act.  In fact, epilepsy is

27  / / /

28  / / /

repeatedly cited throughout the legislative history as an example as a covered disability. See, e.g., S. Rep. No. 101-116, at 22, 31, 39, 62 (1989); H.R. Rep. No. 101-485(II), at 51-52, 62, 72, 79-80, 104 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 303; H.R. Rep. No. 101-485(III), at 28-29, 33, 42, 50 (1990), reprinted in 1990 U.S.C.C.A.N. 267, 445. Notably, Congress was aware that many people with epilepsy use medication to control its effects. See, e.g., H.R. Rep. No. 101-485(II), at 52; H.R. Rep. No. 101-485(III), at 28, 29; see also 135 Cong. Rec. E1575 (1989) (statement of Rep. Coelho) (testifying that an overwhelming majority of people with epilepsy use medication to control the condition). In short, even though Congress was aware that the effects of epilepsy could be mitigated either by medication, it still recognized that the underlying impairment itself is a disability under the ADA. Not to acknowledge that Mr. Jibben is disabled would undermine Congress' intent in enacting the ADA to protect people with epilepsy and other disabilities from discrimination.

## CONCLUSION

For all of the foregoing reasons, the Defendant's Motion for Summary Judgment should be denied. Specifically, this Court should find that Mr. Jibben is disabled under the Americans with Disabilities Act as a matter of law.

Respectfully submitted,

Gina C.R. Fiss, Esquire
EPILEPSY FOUNDATION
4351 Garden City Drive
Landover, MD 20785
(301)918-3762
COUNSEL FOR AMICUS CURIAE
EPILEPSY FOUNDATION

By _Gina Fiss_

16

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief contains 6,929 words, and is printed in Times Roman 12 -point font.

BY _____

Gina Fiss, Esquire

A

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

U.S. Mail to Counsel for Plaintiff, Victor Perri, Victor Perri & Associates, 633 South Fourth

Street, Suite #4, Las Vegas, Nevada 89101, and to Counsel for Defendant, Robert K. Jones, Esq.,

Catherine l. Dehlin, Esq., and Sandra J. Creta, Esq., Quarles & Brady Streich Lang,LLP, One

Renaissance Square, Two North Central Avenue, Phoenix, Arizona 85004-2391 on this the 16th

day of March, 2004.

BY _____
              Gina Fiss, Esquire

B

**Selman Breitman LLP**
ATTORNEYS AT LAW

1

## CERTIFICATE OF MAILING

2       I HEREBY CERTIFY that on March 19, 2004, I caused to be served a true and

3   accurate copy of the foregoing **MOTION FOR LEAVE TO FILE BRIEF AMICUS**

4   **CURAIE AND BRIEF OF THE EPILEPSY FOUNDATION IN SUPPORT OF**

5   **PLAINTIFF'S MOTION IN OPPOSITION TO DEFENDANT'S MOTION FOR**

6   **SUMMARY JUDGMENT** by placing a copy of the same in the United States mails,

7   postage prepaid thereon, addressed as follows:

8   Victor M. Perri, Esq.                          Attorneys For Plaintiff Jared Jibben
    Perri & Associates                             Telephone: (702) 285-1340
9   633 S Fourth Street, Suite 4                   Fax: (702) 387-2484
    Las Vegas, NV  89101
10

11  Robert K. Jones, Esq.                          Attorneys For Defendant United Parcel
    Catherine I. Dehlin, Esq.                      Service
12  Sandra J. Creta, Esq.
    Quarles Brady Streich Lang, LLP
13  One Renaissance Square
    Two North Central Avenue
14  Phoenix, AZ 85004-2391

15  I declare that I am employed in the office of a member of the bar of this court at whose

16  direction the service was made

17

18
                        BONNIE KERKHOFF JUAREZ, an
19                      employee of Selman · Breitman LLP

20

21

22

23

24

25

26

27

28

8516.1  699.17346